- I have testified as an expert in claims handling issues or insurance operations in multiple courts and jurisdictions and have attached my list of depositions and court appearances as schedule A.
- I have no publications in the last 10 years.

**Present Assignment**

I have been retained by the insured (plaintiff Plaquemines Parish School Board) to review its commercial property claim and other damages brought against its insurer (defendant Industrial Risk Insurers, et al) for damages incurred as a result of Hurricane Katrina, named by the National Weather Service, that struck Louisiana and the Gulf Coast states, on August 29, 2005.

I am being compensated at a rate of $275 per hour for this review, $137.50 per hour for travel, $350 per hour for depositions (4 hour minimum) and trial testimony. I have no financial interest in the outcome of the litigation.

I have been asked for my opinion regarding insurance industry practices relating to the handling of insurance policies, the claims these policies insure against and the obligations of those who write the policies for the interest of its insureds, and specifically whether the actions and in actions of the defendants complied with these industry practices, with defendants obligations under the policy and or with applicable law. My curriculum vitae regarding my education, training and experience, is incorporated herein. My opinions will be based on my employment, experience, education and training in the insurance industry based upon reasonable and prudent claims practices.



EXHIBIT A

**Issues**

The central issues surrounding the lawsuit are which damages were caused by wind and rain which are covered under the policy and which damages were caused by flood which are excluded damages. There is no question that these buildings suffered severe damage. Further, there is no issue that the amount of damage greatly exceeds the $15,000,000 policy limit, in addition to the $1,500,000 deductible.

There is no question that the policyholder has submitted damages for wind and rain on four School Board locations that far exceeds the $15,000,000 payable under the policy.

As a code upgrade policy the policyholder's liability exposure of damages on the $11,742,442 acknowledged payment will be well over $16,500,000.00 on code upgrade alone. The lack of the insurers clarification of code upgrade even in there conceptual estimates through the last payment in July, 2008 is arbitrary and capricious in putting their interests before those of the insured.

IRI has failed to accept the insured's presentation of damage which decision is arbitrary and capricious. This decision has caused this claim to exceed all reasonable expectations that one might anticipate in an adjustment of the damages suffered by this insured.

A review of the Gilbane appraisal shows that it is really more of a conceptual estimate of damage, rather than a line by line item of the damage as estimated and submitted by the insured specifically for four locations, and generally for all of the others with no code upgrade explanation.

IRI is requiring the insured, through its attorneys, to follow some undefined claim process in adjusting the loss. Louisiana statutes are quite clear as to what an insured must do in submitting a claim for damages it has suffered as a result of a loss. It is not my role to define the law, but rather to state what the acceptable claims practices would be in handling a claim in Louisiana.

IRI, through their representatives and attorneys, are attempting to require the insured to supply unnecessary documents and undefined proof in an obvious attempt to stall final payment of the loss. This action is arbitrary and capricious on their part.

On May 2, 2006, Scot Archer of Axis, the adjusters hired by IRI, advised the insured that the estimator, Gilbane, had constructed a conceptual estimate applying to all of the school locations. This idea of a conceptual estimate does not clarify the real or actual damage, but is just theoretical concept of what the damage should be.

With a loss of this size and magnitude, the policyholder must get the assistance of their insurer. IRI is requiring the insured to submit such things as building codes (available to Gilbane as public documents) and extraneous damage descriptions which are unnecessary to the evaluation of the damages suffered by the insured. IRI has the resources and responsibility to evaluate all the damage the insured has suffered.

The policyholder secured an independent damage evaluation to review four of its 19 locations with the intent of clearly showing the damage for wind exceeded the $15,000,000 in coverage plus the $1,500,000 deductible. IRI's response was a conceptual estimate of "maybe" damages.

What is even more arbitrary and capricious in the handling of this claim is that the insurer actually took depreciation on the value of damage they only conceptualized. Computing actual cash value (which in this case is ludicrous and just downright wrong) when there is no explanation of how they arrived at their actual cash value approach, other than an across-the-board depreciation deduction, is arbitrary and capricious claims handling. In order to properly determine actual cash value, one must locate each damaged product, determine its remaining life expectancy, determine present-day replacement cost, deduct its used life, and allow reasonable installation cost of the product before determining its actual cash value. If an allowance is to be granted for code upgrade materials, taking depreciation on building

10

PPSB/AMOR000010

damage that is required to be upgraded by law is incorrect. One can not depreciate something that is being upgraded because of statue.

The policyholder is entitled to a real evaluation of the actual cash value allowance rather than one based on some compromise standards that only fit the insurer's pocketbook.

A specific example of the poor handling of this claim is illustrated in the May 2, 2006 letter from Mr. Archer, of Axis. He advises that Gilbane has conceptually estimated the total hurricane damage in the amount of $44,228,534. Of that amount, Gilbane has estimated that windstorm damage consists of $12,331,000 based on replacement costs. Depreciation, specific to the windstorm, has been estimated to be $3,441,517 which resulted in an estimated actual cash value building loss of $8,890,21 without code upgrade clarified in the conceptual appraisal.

According to the Axis letter, in Gilbane's estimate they utilized an average depreciation percentage of 27.91% for the various school locations in calculating the actual cash value amount. The letter further states that they are attaching a work in progress claim schedule, based on a damaged model prepared by Gilbane Cat-Response. How Gilbane determined what was caused by flood damage, and what was caused by wind that came before the flood, and the resulting damage by rain to the buildings is undefined and unexplained.

Where the 27.91% for depreciation came from, is undefined, unclarified and not explained. They might have used 10% or maybe 15%, or perhaps 80%. Any of these evaluations could have been pulled from the air as the 27.91% figure used.

There is a subsequent issue to be decided in the determination of replacement cost to actual cash value and that is how overhead and profit was used in the computation of the values and whether or nor overhead and profit was properly applied but this will have to be determined when all the documents are produced.

The May 2, 2006 letter from Axis also states that based on information that has been provided, Gilbane was unable to specify the amount of extra expenses, net of non-continuing expenses, and the percentage of those charges that has been caused by wind as opposed to flood for purposes of a reasonable allowance of extra expense within the current advance payment analysis they are suggesting the utilization of 25% of the total submitted extra expense of $1,477,432.

The policyholder entitled to payment of what the damage actually is.

## Opinion

It is my opinion that,

- IRI has placed an unnecessary burden on the insured to prove damages above what is required by the policy, and usual and customary insurances practice    instead of on itself to thoroughly investigate the loss suffered by Plaquemines Parish School Board. Such handling was done in an arbitrary and capricious manner.
- IRI forced the policyholder to file suit to receive proper compensation for damages suffered under the policy.
- IRI failed to properly interpret the coverage of their own policy when they arbitrarily and capriciously claimed the policyholder's submission of damages was inadequate.
- The idea of a conceptual appraisal without specific loss data for each building is bad claims handling.
- The time delay of reaching their final opinion, some one year after the loss, was uncalled for and unsubstantiated from my file review.
- To arbitrarily and capriciously assign actual cash values on a flat rate basis without file substantiation demonstrates a one-sided claims approach of the insurer putting their interests before those of the insured.
- The lack of file documentation clarifying wind and rain damage versus flood damage is arbitrary and capricious.
- The insured submitted detail estimates for four of the 19 properties   which clearly indicated the policy limit had been exposed.  The loss should have been adjusted on that basis or timely defended with proper engineering reports and investigation to

12

support the insurer's allegations of the amount of flood damage. To do otherwise is arbitrary and capricious, and not good claims handling.

- The continued rejection of the policyholder's request of uncontested damages submitted to IRI, and their stating that the insured failed to give adequate description of the damage is unfounded based on the reports submitted.
- IRI's claims actions were, and continue to be, arbitrary and capricious in the handling of the claim from the start.
- Failure to clarify the code upgrades allowed to the policyholder is arbitrary and capricious.

**Summary**

Hurricane Katrina was a horrible storm and the damage was devastating. There are legitimate reasons why an insurance company could contest flood versus wind damages. However, the insurance company's position must be supported by legitimate evidence in their file to explain how they arrived at such an evaluation. The idea of a conceptual estimation of damage when the damage was available for inspection is not acceptable. When the agreed valuation of the buildings exceeded $68,000,000, and failure to honor the claim, which only required $16,500,000, in damages, is indefensible.

Insurance policies are designed to pay covered losses when the policyholder needs protection. However, the manner in which IRI has acted in the handling of this claim are not good and usual customary claims practices.

It is my understanding that the School Board anticipates receiving additional information from defendants including Gilbane file that is relevant to my review.

The opinions I have given in this review are based on material reviewed and I reserve the right to modify and/or add to my report and my opinion, if discovery develops additional information.

13

PPSB/AMOR000013